REICHARDT v. HILL et al.

(Circuit Court of Appeals, Sixth Circuit. November 8, 1916.)

No. 2797.

1. BROKERS ⬥⟿42—"MERCHANDISE BROKERS"—COMMISSION MERCHANTS.

Ordinances of the city of St. Louis declare that every person, firm, or company of persons who, for a commission, shall negotiate between the owner and purchaser for the purchase or sale of goods, wares, or merchandise, or other articles of commerce, are merchandise brokers, who shall be required to pay an annual license fee of $50, and that any person doing business as a merchandise broker or commission merchant without the license shall be deemed guilty of a misdemeanor, and on conviction shall be fined. The articles mentioned in the ordinances defining a merchandise broker are the same as those in Rev. St. Mo. 1899, §§ 8540, 8542, defining merchants. Plaintiff, the sales manager of a wholesale grocery company, negotiated a sale of several grocery stores owned by defendant. The value of the several stocks of goods was computed at current wholesale prices, but the values of the other things sold were fixed through negotiations. *Held* that, as the stores were going concerns with facilities for carrying on grocery business, plaintiff in selling the stores was not engaged as a merchandise broker or commission merchant, and not bound to obtain the license.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 43; Dec. Dig. ⬥⟿42.

For other definitions, see Words and Phrases, First and Second Series, Merchandise Broker.]

2. CONTRACTS ⬥⟿136—ACTIONS—PROHIBITED CONTRACT.

No action can be maintained on a contract which is itself prohibited by law, though the prohibition be merely implied.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 681–700; Dec. Dig. ⬥⟿136.]

3. COURTS ⬥⟿365—PRACTICE—FEDERAL COURTS—STATE DECISIONS.

A contract made and to be performed within a state is affected by the state laws, and the state decisions will govern its construction.

[Ed. Note.—For others cases, see Courts, Cent. Dig. §§ 950, 952, 955, 969–971; Dec. Dig. ⬥⟿365.]

4. BROKERS ⬥⟿12—LICENSES—ILLEGAL CONTRACTS—ORDINANCES—CONSTRUCTION.

St. Louis ordinances require merchandise brokers to obtain a license, and declare the carrying on of business without a license to be a misdemeanor, punishable by fine. The ordinances are mere excise laws; no qualifications for merchandise brokers other than payment of the license being prescribed. *Held*, that a merchandise broker may maintain an action for commissions for sales effected, though he had not obtained the required license.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 43; Dec. Dig. ⬥⟿42.]

In Error to the District Court of the United States for the Middle District of Tennessee; Edward T. Sanford, Judge.

Action by Arthur C. Reichardt against H. G. Hill and the H. G. Hill Grocery & Baking Company. There was a judgment for defendants and plaintiff brings error. Reversed and remanded.

Wm. Sacks, of St. Louis, Mo., for plaintiff in error.

E. A. Price, of Nashville, Tenn., for defendants in error.

Before WARRINGTON and KNAPPEN, Circuit Judges, and SESSIONS, District Judge.

WARRINGTON, Circuit Judge. In the amended form of the action below, Reichardt, plaintiff, sought to recover compensation for services alleged to have been rendered by him in September, 1911, at the request of Hill and the Hill Grocery & Baking Company, defendants, in procuring a purchaser for their nine grocery stores situated in St. Louis. Plaintiff alleges that his compensation was to be given in the form of an electric coupé of the value of $3,500, and that pursuant to this contract he negotiated the sale of the stores to the Maurer-Remley Company at a price of more than $52,000. Admittedly, the stores were sold to the purchaser named and the purchase price was paid. However, defendants deny that they requested plaintiff to secure a purchaser, or that they ever promised to compensate plaintiff for so doing, or that plaintiff did anything to aid the sale, except only in a friendly and gratuitous way to bring the parties together. As a further defense the defendants allege plaintiff's failure to comply with a certain ordinance of the city of St. Louis, where the sale was negotiated and the contract, if entered into at all, was made, and that in consequence of such failure the ordinance forbids recovery upon the contract in dispute. This ordinance defines a "merchandise broker," exacts of every such broker doing business in that city payment of $50 in advance for an annual license, and imposes a penalty upon any person there doing business as a merchandise broker without such a license. The evidence is in conflict touching the existence of the contract relied on. It appears that plaintiff had in the course of his business career of 20 years negotiated other sales similar to this and received commissions thereon, though it is not shown that he ever had a license under the ordinance, and concededly he had none at the time of the present transaction. At the close of all the evidence the defendants presented a motion for a directed verdict. The court was of opinion that so far as the question of fact was concerned—that is, whether the contract was entered into—the evidence required submission of the case to the jury, but that the alleged contract must be tested by the law of Missouri, and that since plaintiff failed to secure a license under the ordinance he has "no right of action on the contract, if it was in fact made"; and upon this ground alone the motion to direct a verdict was granted. Under the errors assigned, this ruling presents the only question for determination here.

[1] In view of the conclusion reached by the learned trial judge that there was a question of fact to be determined by the jury, in which conclusion we concur, it must be assumed for the purposes of this opinion that the contract alleged was in truth made. The controlling inquiries are: What application has the ordinance to the transaction? and if applicable, what is its effect? We hesitate to consider the first of these inquiries, for the case was tried below upon the theory involved alone in the second inquiry; still, in view of our conclusion that a new trial will have to be awarded, we are constrained to believe that the

theory of relevancy of the ordinance presents the initial question. The ordinance is embodied in the Revised Code of 1912 of the City of St. Louis, and comprises three sections, viz.: 2120, approved October 20, 1877; 2121, approved February 28, 1899; and 2122, approved December 30, 1898. These sections were in force during the whole of 1911, and it was admitted at the trial below that the sections of the ordinance were "passed by the city of St. Louis, and within its authority." The sections follow:

"Sec. 2120. *Merchandise Broker Defined.* Every person, firm or company of persons who for commissions, brokerage or other compensation shall negotiate between the owner and purchaser, or their respective agents, for the purchase or sale of goods, wares, or merchandise or other articles of commerce, is hereby declared to be a merchandise broker, whether such negotiations are on his own account or that of an employer or other person.

"Sec. 2121. *License of Merchandise Broker and Agents or Assistants.* Every merchandise broker and every member of a firm or company of merchandise brokers, and every clerk or assistant thereof, doing business as such in this city, shall pay in advance for annual license the sum of fifty dollars.

"Sec. 2122. *Penalty.* Any person doing business as a merchandise broker or commission merchant, whether alone or as a member of a firm or company of brokers, or as a clerk or assistant, or employé of such person or firm, without the license provided for in this article, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall pay a fine of not less than twenty-five dollars nor more than five hundred dollars."

Counsel agree that this ordinance has never been construed by any court of Missouri, and the absence of such a decision is to be regretted. As to the relevancy of the ordinance, it is to be observed that a "merchandise broker" is defined to be a person who for a consideration "shall negotiate between the owner and purchaser * * * for the purchase or sale of goods, wares, or merchandise, or other articles of commerce." While the first two sections speak only of a merchandise broker, the last section mentions also a commission merchant— "merchandise broker or commission merchant"; yet the record furnishes no means for differentiating the merchandise broker from the commission merchant for any purpose indicated by the ordinance. However, the articles mentioned in the ordinance to define a "merchandise broker" are substantially the same as those contained in a Missouri statute to define a "merchant," and the definition of the latter seems to include a "commission merchant" (2 Rev. St. of Missouri [Ed. 1899] §§ 8540 and 8542, especially proviso in latter section); thus, whether the ordinance alone or both the ordinance and the statute be considered, the business of a merchandise broker and that of a commission merchant are practically the same, and may safely be so treated in determining the scope of the ordinance. The subjects embraced in the ordinance, which are seemingly in essential part designed to characterize and identify the persons in contemplation, are described generically, "goods, wares, or merchandise, or other articles of commerce," and these words must be regarded as of prime importance in determining the present relevancy of the ordinance. The words, it is true, are to be given a broad meaning, but they appropriately indicate and so comprehend articles which are involved in the usual and daily transactions occurring between dealers, such as wholesalers and

retailers, for the purpose of supplying their ordinary customers. The multiplicity of such transactions would naturally furnish opportunities for the conduct of a distinct business, such as that of brokers, to facilitate the customary barter and trade of dealers. Moreover, the association of "goods, wares, or merchandise" with "other articles of commerce" casts additional light upon the nature of the transactions which fall reasonably within the purview of the ordinance; for such association must signify that the "goods, wares, or merchandise" in contemplation are "articles of commerce"; noscitur a sociis. Such articles are not exceptional; they are the ordinary things, the staples, that enter into the every-day trade of merchants.

Now it is difficult to see how such an ordinance as this could have been intended to apply to a transaction of the character we have here. Here were nine grocery stores maintaind in nine different localities and designed to serve as many different communities in the city of St. Louis; they apparently comprised separate and distinct outfits, such as fixtures, means and appurtenances, horses and wagons, and stocks of goods, such as were usually required in the conduct and operation of separate stores; in a word, they were going concerns, and, inferentially, each was possessed of a good will of more or less value. True, the relations of defendants to the buildings, the realty, where the grocery stores were severally maintained and carried on, whether as lessees or owners, do not appear; but the entities, the stores, are none the less distinctive. All these objects are to be treated as a unitary subject, when considering the sale here negotiated and completed at a price of upwards of $52,000. In fixing the selling value of the stores, the stocks of goods, it is true, were estimated at current wholesale prices; but the other things entering into the sale involved estimates of value and also negotiations before the total value and price were agreed on. Can it be that all this involved simply a purchase and sale of "goods, wares, or merchandise, or other articles of commerce" within the true intendment of the ordinance? The fact that there were articles in each of these stores, say a stock of goods, which if separately considered would fall within the descriptive words of the ordinance, cannot justify the isolation of those articles for the purpose of treating them as the subjects of separate sales; they, like the other things sold, are to be regarded as constituting essential parts of an exceptional and unitary subject-matter of sale; certainly this must be true as respects a comparison of such a sale with the sales contemplated by the ordinance.

The difference between the present sale and the sales seemingly covered by the ordinance, derives emphasis from the fact that many of the things involved in the former, such as fixtures and the like, must have lost their identity as ordinary articles of trade, since it is to be presumed that they had been fitted and adapted to the particular places in which they were used and so did not possess the characteristics which might originally have brought them, as well as the materials from which they were made, within the descriptive words of the ordinance; and, moreover, it does not appear that these articles did not in

value constitute a substantial portion of the sale, since their continuance in the particular stores to which they belonged would naturally preserve values in them which could not otherwise have been realized; it therefore cannot be safely said that the stocks of goods embraced in the sale so far dominated the transaction as to bring it within the meaning of the ordinance. This would seem to be the inevitable result of taking over the stocks of goods at wholesale prices; for no advantage is perceivable in so purchasing the stocks of goods, instead of securing their equivalents in the open market, unless the other things purchased were material objects of the transaction. Above all, when stores are sold as going concerns, the good will usually attending them serves strongly to characterize the transactions as falling without the legislative purpose here disclosed; and while the record does not show the value of the good will which inferentially belonged to these stores, the customary inclusion of good will in such sales as this is helpful to a right interpretation of the ordinance.

It is not to be overlooked that the plaintiff testified that he had in the course of his long business career negotiated a number of sales similar to this one; but it is noteworthy that this seems to be the first time any one ever claimed that such sales were intended to be included within the ordinance. Indeed, such other sales seem to have been rather a negligible incident of plaintiff's regular business and conducted without any purpose of entering into the brokerage business. He was the secretary, treasurer and sales manager of the Niese Grocery Company, and, it is true, he would make sales of his company's goods two or three times a week to other stores, including those of the Hill Company which was one of its best customers; but it is not shown or claimed that he made these sales on commission or as a broker. Of course, such sales were, as he testified, the same in character as those made by other city salesmen. He also testified, in substance, that his object in bringing about sales of other stores was to keep in touch with them so as to make of the buyers customers for his own store. This testimony does not tend to show either that the plaintiff was holding himself out as a broker or engaged in the brokerage business in the sense that he was amenable to the license fee (Chadwick v. Collins, 26 Pa. 138, 139; Black v. Snook, 204 Pa. 119, 120, 53 Atl. 648; Pope v. Beals, 108 Mass. 561, 562; Johnson v. Williams, 8 Ind. App. 677, 678, 36 N. E. 167); the effect of such testimony would seem to fortify the distinction pointed out between sales like the one here involved and those contemplated by the ordinance. It need not be said that, if the foregoing view of the ordinance is correct, the motion below to direct a verdict should have been denied.

[2-4] But as the ordinance has received no judicial construction in Missouri and additional evidence may be introduced at the next trial, we deem it necessary also to consider the ground on which the motion to direct was granted. We thus come to the question, whether upon the theory of applicability of the ordinance it forbids recovery upon the contract in issue. The answer to this question must depend upon the purpose and effect of the ordinance. The rule that an action can-

not be maintained upon a contract which is prohibited by law is, of course, to be conceded. The ordinance does not in express terms prohibit such contracts as the one now in dispute. Still the prohibition need not be express; it may be implied. The prohibition of an act is implied in the imposition of a penalty for committing it. The prohibition, and the only one, to be deduced from this ordinance, touches pursuit of the business without first paying the license charge, and to secure payment of this charge is the paramount object of the ordinance. This will be clearly seen through close scrutiny of the ordinance as a whole. The ordinance recognizes the particular business to which it relates as entirely legitimate. For it prescribes no qualification as respects the persons desiring to engage in the business save only ability to pay an annual license charge of $50, and imposes a penalty on persons engaging in the business only because of their failure to pay that charge. It prescribes no regulations whatever according to which the business shall be conducted. It points out no public evil for either prevention or repression. It discloses no scheme of legislative policy except only a plan for the collection of revenue.

The most, then, that can be said of the ordinance is that it in effect lays a tax on persons who engage in the business, and unless the tax is paid imposes a penalty on such persons; but it nowhere discloses an intent to inflict the penalty of illegality upon contracts made between the delinquent broker and third persons. This interpretation of the ordinance admits of recovery on the contract under what seems to be a settled rule of judicial decision in the state of Missouri in cases (called by Judge Bland the "Missouri license cases") similar to the present one. And since the ordinance was adopted and the contract made in Missouri, and in view of the apparent harmony between the decisons of the Courts of Appeals and the Supreme Court of that state concerning the rule of the Missouri license cases, we shall for present purposes treat that rule as the law of this case; for in such a situation as this we do not regard the case of Anglo-American Land, M. & A. Co. v. Lombard, 132 Fed. 721, 741, 68 C. C. A. 89 (C. C. A. 8) as applicable. And see In re Gilligan, 152 Fed. 605, 606, 81 C. C. A. 595 (C. C. A. 7).

In Tooker v. Duckworth, 107 Mo. App. 231, 235, 80 S. W. 963, 964, a real estate broker, without having obtained a license under a city ordinance similar to the one here involved, was allowed to recover for services performed for the defendant, Judge Bland saying:

"The purpose of the ordinance * * * is to raise revenue for the city, not to make that which was theretofore valid invalid if the ordinance is not complied with, or to impinge upon the right of real estate agents to make contracts. Whether or not the plaintiff is a licensed real estate agent is no concern of the defendant. As was said in the Prince Case [20 Mo. App. 332], it was essentially, and we might add exclusively, a matter between the city and the plaintiff. There are authorities in other states to the contrary, but they have not been followed in this state. * * *"

In Rothwell v. Gibson, 121 Mo. App. 279, 285, 98 S. W. 801, 803, a real estate broker's commission was denied under a statute which forbade offering real property for sale without the written authority of

the owner, but after reviewing, among others, the "Missouri license cases," Judge Bland distinguished the license cases thus:

"The case is also distinguishable from the Missouri license cases, supra, in this: The statutes requiring a merchant and real estate broker to take out a license to do business are mere excise laws, enacted for the purpose of raising revenue. No private individual has any special interest in them, nor were they enacted for the purpose of protecting the interests of private individuals, and hence no individual is in a position to invoke their noncompliance to defeat his contracts with an unlicensed merchant or real estate broker."

Indeed, as early as 1853, in Columbus Ins. Co. v. Walsh, 18 Mo. 230, 238, in passing upon the right of the insurance company to recover money paid for a loss under its policy in ignorance of subsequent insurance which in terms avoided the policy, and in denying the defense of illegality of the policy by reason of the company's failure to obtain a license, it was said:

"These agencies are required to obtain a license—to pay a tax, and upon neglect or failure, the statute makes them liable to a penalty of $500; but it does not declare contracts made by them void. The law requires a merchant to obtain license before he can sell his merchandise, yet should he sell without license and then sue to collect his debt, no person ever supposed the omission to obtain license would defeat his right to sue—would be a defense to his debtor."

And it is to be observed that in Ehrhardt v. Robertson Bros., 78 Mo. App. 404, 408, 409, when apparently distinguishing Columbus Ins. Co. v. Walsh, it was said of the statute law involved in the Walsh Case that its object was revenue. See, also, Prietto v. Lewis, 11 Mo. App. 601; Prince v. Eighth Street Baptist Church, 20 Mo. App. 332, 334; Smythe v. Hanson, 61 Mo. App. 285.[1] It should be said of Prince v. Baptist Church, Tooker v. Duckworth, and Prietto v. Lewis, above cited, that Judge Sanford believed that, if considered alone, they would entitle plaintiff here to recover on his contract, and that they are consistent with all the decisions of the Missouri Supreme Court, except one—Tri-State Amusement Co. v. Amusement Co., 192 Mo. 404, 90 S. W. 1020, 4 L. R. A. (N. S.) 688, 111 Am. St. Rep. 511, 4 Ann. Cas. 808. We are not satisfied that they are not consistent also with that decision. The reason for this is that so far as appears none of the ordinances construed in the three decisions first named declared any rule of policy save only a plan for the collection of revenue, similar in substance to that of the present ordinance; while the statute passed

[1] It will not be amiss, though it is not strictly necessary, to call attention to the following decisions of other states which are in accord with those above cited in the opinion: Pangborn v. Westlake, 36 Iowa, 546, 548, cited with approval in Miller v. Ammon, 145 U. S. 421, 426, 12 Sup. Ct. 884, 36 L. Ed. 759; Ruckman v. Bergholz, 37 N. J. Law, 437, 440; Larned v. Andrews, 106 Mass. 435, 437, 8 Am. Rep. 346; Fairly v. Wappoo Mills, 44 S. C. 227, 233, 22 S. E. 108, 29 L. R. A. 215; Aiken v. Blaisdell, 41 Vt. 655, 665; Niemeyer v. Wright, 75 Va. 239, 242, 40 Am. Rep. 720; Taliaferro v. Moffett, 54 Ga. 150, 153; Watkins Land Mortgage Co. v. Thetford, 43 Tex. Civ. App. 536, 538, 96 S. W. 72; Walker v. Baldwin, 103 Md. 352, 354, 63 Atl. 362; Jones v. Berry, 33 N. H. 209, 210; Ober v. Stephens, 54 W. Va. 354, 358, 46 S. E. 195; Mandlebaum v. Gregovich, 17 Nev. 87, 92, 28 Pac. 121, 45 Am. Rep. 433; Randall v. Tuell, 89 Me. 443, 445, 36 Atl. 910, 38 L. R. A. 143.

on in the Tri-State Amusement Case declared a distinct rule of public policy independently of any purpose to collect revenue. The Tri-State Amusement Company was an Illinois corporation and seeking in that case to enforce a contract entered into between it and the defendant and intended to be performed in Missouri. The defense relied on, and on demurrer sustained, was that the plaintiff had not complied with the statute just alluded to and that the contract was invalid for that reason. The statute in express terms (1) prohibited any foreign corporation, organized for pecuniary profit, to transact business in the state until it should establish an office therein where legal service might be had upon it, and where certain prescribed corporate books should be kept; (2) subjected such corporations "to all the liabilities, restrictions and duties" which were or might be imposed upon domestic corporations of like character, and denied to them any "other or greater powers" than were possessed by "domestic corporations"; and (3) required them each to file with "the secretary of state a copy of its articles or certificate of incorporation," with a sworn statement showing "the proportion of its capital stock which is represented by its property located and business transacted" in the state, and also to pay "incorporation taxes" and fees equal to those exacted "of similar domestic corporations." It was held in respect of these provisions (Tri-State Amusement Co. v. Amusement Co., supra, 192 Mo. at page 420, 90 S. W. at page 1024, 4 L. R. A. [N. S.] 688, 11 Am. St. Rep. 511, 4 Ann. Cas. 808):

"In this way the lawmakers intended to make foreign corporations become locally incorporated in like manner and with like obligations and liabilities as are required of domestic corporations, and prohibits such foreign corporations from transacting business in this state until they have become so locally incorporated. * * * If the statute had stopped here, and made no other provision, or provided no other penalty, there would be no room for cavil that it was the intention of the Legislature to make contracts invalid that were entered into in this state by foreign corporations before complying with the statute."

True, as the court pointed out, the statute also provided that every such corporation should pay a fine of $1,000 and that it should not be entitled to maintain any suit or action upon any demand whatever, where it failed to comply with the statute; but to regard these provisions as having been designed in and of themselves, especially the one prescribing the fine, to reach and invalidate such contracts as the one there in issue, would be to ignore the corporate status with which it was the intention of the statute to invest foreign corporations entering the state for business objects. This status was the dominating feature of the statute, and its object was, as Judge Marshall in substance said in the course of the opinion, to force foreign corporations doing business or making contracts in the state to place themselves on an equality with domestic corporations; obviously, such an object can be but remotely related to the idea of securing revenue.

There are still further reasons for believing that the Missouri license cases are reconcilable with the Tri-State Amusement Case. They are not even alluded to, much less overruled, in that case; and in view of the extensive examination made of Missouri decisions in the Tri-

State Amusement Case, it is not to be presumed that the Missouri license cases would have been overlooked if they had been regarded as in conflict with the case in hand. Further, before the statute involved in the Tri-State Amusement Case was there interpreted, it had been given substantially the same construction by the two Courts of Appeals of Missouri (Williams v. Scullin, 59 Mo. App. 30; Ehrhardt v. Robertson Bros., supra, 78 Mo. App. 404); yet such construction of the Courts of Appeals was deemed by them to be quite consistent with the decisions in the Missouri license cases; and in Rothwell v. Gibson, supra, 121 Mo. App. at page 285, 98 S. W. 801, the Tri-State Amusement Case was one of a group of cases from which the Missouri license cases were expressly distinguished.

Attention has been called to the case of Downing v. Ringer, 7 Mo. 585. Ringer, as assignee of a note given by Downing in purchase of an unplatted lot, was denied recovery because of a statute forbidding under penalty any person to sell or offer for sale any lot within a town or village before a map or plat of the town was made and acknowledged and then deposited in the recorder's office. The rule was there laid down broadly that the prohibition of an act is implied in the imposition of a penalty for committing it. But the court must have construed the statute in that case as declaring a rule of policy looking to the protection of the public in respect of sales of unplatted lots; this was sufficient to characterize the statute and to exclude it from the category of revenue measures. The case therefore does not differ in principle from the Tri-State Amusement Case; indeed the Ringer Case was there cited and relied on. While it is true, as the court below said, reference is made in both the Ringer Case and Tri-State Amusement Case to Lord Holt's language in the note to his decision in the old usury case of Bartlett v. Vinor, 2 Carth. 251, 252, decided in 1743, stating in substance that the imposition of a penalty implies a prohibition, yet it is to be observed that the rule might well be applied in those cases without at all impinging upon the principle underlying the Missouri license cases, for these license cases hold that the contracts there in issue were not intended to be penalized by the legislative provisions construed; and the effect of this was in no wise opposed even to Lord Holt's rule, since under that rule, as Baron Parke said in Cope v. Rowlands, 2 M. & W. 149, 157, "the sole question is whether the statute *means to prohibit the contract*." And likewise, as Mr. Justice Wayne said in the leading case of Harris v. Runnels, 53 U. S. (12 How.) 79, 83, 13 L. Ed. 901:

"The statute must be examined as a whole, to find out whether or not the makers of it meant that a contract in contravention of it should be void, or that it was not to be so. In other words, whatever may be the structure of the statute in respect to prohibition and penalty, or penalty alone, that it is not to be taken for granted that the Legislature meant that contracts in contravention of it were to be void, in the sense that they were not to be enforced in a court of justice."

And see Dunlop v. Mercer, 156 Fed. 545, 555, 556, 86 C. C. A. 435 (C. C. A. 8); Victorian Daylesford Syndicate, Limited, v. Dott [1905]

2 Ch. 624, 630; Carland v. Heckler, 233 Fed. 504, 506, —— C. C. A. —— (C. C. A. 6).

The rule, then, to be deduced from the two lines of Missouri decisions above pointed out and sought to be distinguished, may be broadly stated thus: As respects an ordinance or a statute requiring payment of a license fee or compliance with other provisions as a condition to the pursuit of a business or calling, the effect of such ordinance or statute upon contracts made by persons defined therein, in the course of such business or calling, will, in the absence of express provision, be determined by the object of the measure; if the object is merely to provide a fiscal expedient, an inhibition against pursuit of the calling or business to be implied alone from the imposition of a penalty for failure to pay the license fee, will not be construed to reach and invalidate such contracts; but if the object is to exact qualifications of the applicants or otherwise to furnish protection to the public, even though the object also include revenue, such an implied inhibition will be as effective as an express provision would be to invalidate contracts. Treating the ordinance then as applicable to transactions like the one here involved, it plainly does not, under this rule, affect the contract.

The judgment will accordingly be reversed, with costs, and the case remanded, with direction to award a new trial.